

FILED BY _____ D.C.

NOV 2 1 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

## MIAMI DIVISION

BRIAN EVANS,

Plaintiff,

v.

CREATIVE ARTISTS AGENCY, LLC, and

STEVE LEVINE, individually and in his capacity as an agent of Creative Artists Agency,

LLC.

Defendants.

Case Number: _____

## COMPLAINT FOR DAMAGES, RESCISSION, DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND JURY TRIAL DEMAND

Plaintiff Brian Evans ("Plaintiff"), appearing pro se, brings this action against Defendants

Creative Artists Agency, LLC ("CAA") and Steve Levine ("Levine"), and alleges as

follows:

1

## INTRODUCTION

Plaintiff acted as a whistleblower by responsibly reporting misconduct by a CAA-represented client, and Defendants' subsequent retaliation forms the core of this action.

This action arises from Defendants' years-long pattern of intentional deception, retaliation, manipulation, interference, and coercion designed to silence Plaintiff and protect a highly profitable client of CAA who engaged in inappropriate, explicit misconduct toward Plaintiff. Plaintiff had a longstanding and positive professional relationship with Defendants, during which he booked CAA-represented headliners, produced the Maui Celebrity Series, and served as an approved opening act for Joan Rivers and other major entertainers. Plaintiff reasonably relied on Defendants' assurances that his career was progressing, supported, and being actively promoted—assurances that Levine repeated through emails promising multiple opening-act opportunities and industry circulation of Plaintiff's work.

Between 2023 and 2024, Levine repeatedly confirmed in writing that he was actively working for Plaintiff. On March 26, 2024, Levine emailed Plaintiff: "I'm working on your stuff this week, FYI." On April 10, 2024, Levine informed Plaintiff: "Books went out to 2 management companies who produce film and TV. Will work on the gigs next week," and later that same day reassured Plaintiff that he would "follow up in a week." Additional communications confirm that Plaintiff had received opening-act approvals from multiple headliners—real, concrete opportunities demonstrating that Plaintiff's economic expectancy was neither hypothetical nor speculative.

Everything abruptly shifted only after Plaintiff responsibly reported receiving explicit, perverse videos from a CAA client, which placed Defendants in a position where acknowledging the misconduct would jeopardize their financial interest in that client. When Plaintiff tried to show Levine the evidence, Levine responded on September 29, 2023: "Just tell me (here). Videos really make me nervous," and refused to view the videos. Rather than address the wrongdoing, Defendants rejected the evidence, retaliated against Plaintiff, withdrew every promised opportunity, and ultimately engineered an unconscionable settlement mechanism to silence him permanently.

Defendants' own emails further reveal their hidden legal interference. On September 20, 2023, Levine wrote to Plaintiff: "Just tell your lawyer to ignore him or put him off," and stated that the unnamed artist's attorney "has been told to stand down." This demonstrates that CAA and Levine were secretly directing or influencing attorneys on both sides of a legal matter—without Plaintiff's knowledge—to control the outcome and protect a lucrative client, while concealing this involvement from Plaintiff.

Plaintiff was medically vulnerable at the time because he was undergoing actual cancer treatment, psychologically destabilized by surviving the Maui wildfires, and experiencing severe unrecognized PTSD that was not formally diagnosed until 2025 in Florida. Defendants exploited this vulnerability by orchestrating a "Second Settlement Agreement" and coercive undated dismissal documents that Plaintiff did not understand were designed to eliminate all legal recourse. CAA and Levine were not parties to Plaintiff's original settlement with the CAA client, yet they inserted themselves into a subsequent agreement solely to protect themselves and the client and escape liability. They offered nothing in exchange for sweeping immunity, contributed no consideration,

and knowingly structured the agreement to ensure Plaintiff would lose compensation from the original settlement if he dared report or sue them or even contact them to follow up on their own prior promises.

As part of this scheme, the Second Settlement Agreement contained a particularly coercive clause: if Plaintiff contacted CAA or Steve Levine, including for the purpose of following up on performance opportunities and representations they themselves had made in writing, Plaintiff's settlement payments from the unnamed client would immediately cease. This provision weaponized Plaintiff's settlement payments as leverage to silence him permanently regarding CAA and Levine.

Defendants also required Plaintiff to sign undated, jurisdiction-less dismissal orders naming CAA, Levine, and others, with no court, case number, or date identified. These documents were intentionally designed so Defendants could later insert any forum and file them preemptively to terminate any future lawsuit Plaintiff might file once he fully understood what had been done to him. This was not a legitimate settlement. It was a calculated plan to silence a whistleblower, protect a revenue-generating client, sever all avenues of accountability, and ensure Plaintiff could never pursue Defendants for their misconduct.

Plaintiff will provide the First Settlement Agreement, the Second Settlement Agreement, and the referenced emails and screenshots to the Court for in camera review if the Court permits. Plaintiff does not intend to file these agreements publicly as exhibits because doing so would unnecessarily expose the identity and private details of the unnamed client. However, the agreements and correspondence are central to this case and

4

conclusively demonstrate that CAA and Levine—non-parties to the original settlement—
inserted themselves into a later agreement, obtained immunity without consideration, and
structured coercive terms to silence Plaintiff. Plaintiff stands ready to make these
materials available to the Court privately, consistent with confidentiality interests and
applicable law.

Plaintiff now seeks rescission of the unconscionable Second Settlement Agreement,
declaratory relief establishing the invalidity of the undated dismissals, compensatory and
punitive damages, injunctive relief preventing Defendants from enforcing or relying on
the coerced agreement and dismissals, and all other remedies required for justice.

## JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the matter
in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of
different states.

Plaintiff is a citizen of the State of Florida. Defendant Creative Artists Agency, LLC is a
limited liability company organized under the laws of the State of Delaware with its
principal place of business in California. Upon information and belief, none of CAA's
members is a citizen of the State of Florida. Defendant Steve Levine is an individual who
resides in California. Complete diversity of citizenship therefore exists.

Plaintiff permanently relocated to Florida following the Maui wildfires, where he
received a formal PTSD diagnosis that illuminated the coercive nature of the Second
Settlement Agreement. The injuries described herein—including emotional distress,
financial harm, reputational damage, and ongoing professional interference—are

recognized, experienced, and continue to be suffered in the State of Florida, firmly

supporting the exercise of diversity jurisdiction. The amount in controversy, including

lost professional opportunities, reputational harm, emotional distress, and punitive

damages, comfortably exceeds $75,000.

This Court has personal jurisdiction over Defendants because CAA conducts systematic

and continuous business operations in Florida and has purposefully availed itself of the

privilege of conducting activities here. CAA represents well-known entertainers who

frequently perform in Miami, Fort Lauderdale, Orlando, and other Florida venues, and it

maintains ongoing commercial relationships with Florida-based promoters, venues, and

entities. See Keeton v. Hustler Magazine, Inc., 465 U.S. 770 (1984); Louis Vuitton

Malletier, S.A. v. Mosseri, 736 F.3d 1339 (11th Cir. 2013).

Defendants' acts and omissions, carried out through their nationwide entertainment

business, caused injuries that they knew or should have known would be felt in Florida

where Plaintiff now resides and continues his career. The Second Settlement Agreement

and related documents were intended to govern and restrict Plaintiff's professional

activities and relationships on an ongoing basis, including while he lives and works in

Florida, thereby interfering with his contracts and prospective contracts connected to this

forum. Under Licciardello v. Lovelady, 544 F.3d 1280 (11th Cir. 2008), intentional acts

expressly aimed at a forum that cause injury there support specific jurisdiction. Under

Ford Motor Co. v. Montana Eighth Judicial District Court, 592 U.S. 351 (2021), personal

jurisdiction exists where the claims "relate to" defendants' substantial forum conduct;

here, Plaintiff's harms relate directly to Defendants' entertainment and talent-agency

activities reaching into Florida and restricting Plaintiff's ability to work with and through

Defendants while residing here.

Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiff resides in the

Southern District of Florida, the harm manifests here, and Defendants' ongoing business

connections and purposeful availment anchor them sufficiently to this District for legal

accountability.

## PARTIES

Plaintiff Brian Evans is a professional entertainer, producer, author, and Billboard-

charting recording artist and singer who resides in Hallandale Beach, Florida. Plaintiff

has worked in the entertainment industry for decades, producing major projects and

collaborating with world-renowned artists. Plaintiff relocated to Florida after surviving

the devastating Maui wildfires, during which he experienced severe trauma and

worsening emotional distress that culminated in a 2025 diagnosis of PTSD by a licensed

medical professional in Florida. This diagnosis was instrumental in Plaintiff

understanding the coercive dynamics underlying the Second Settlement Agreement that

Defendants orchestrated in bad faith. Plaintiff continues to suffer emotional, financial,

and professional harm in Florida due to Defendants' misconduct.

Defendant Creative Artists Agency, LLC is a limited liability company organized under

the laws of the State of Delaware with its principal place of business in California. Upon

information and belief, none of its members is a citizen of Florida. CAA is a nationwide

entertainment and talent agency with substantial operations in Florida, representing artists

who routinely appear in concerts, performance venues, and high-profile events

throughout Florida, and maintaining deep and ongoing business relationships with Florida-based promoters, venues, media organizations, and production companies.

Defendant Steve Levine is an agent or employee of CAA who personally communicated with Plaintiff, made assurances, rejected evidence, retaliated against Plaintiff, and participated directly in the coercive conduct that damaged Plaintiff. Levine resides in California and acted within the scope of his employment with CAA at all relevant times.

Defendant Steve Levine is an individual residing in California and, at all relevant times, acted as an agent and employee of Creative Artists Agency, LLC. Levine is sued individually and in his capacity as an agent of Creative Artists Agency, LLC.

Does 1–10 are individuals and entities whose identities are not yet known but who participated in drafting, coordinating, advising upon, or enforcing the coercive Second Settlement Agreement and the undated dismissals, including but not limited to attorneys and other agents. Plaintiff will amend this Complaint to name them once identified in discovery.

## FACTUAL ALLEGATIONS

### Plaintiff's Longstanding Professional Relationship with CAA

For years, Plaintiff maintained a positive professional relationship with CAA and Levine, during which Plaintiff produced entertainment events, booked CAA talent, and opened for CAA-represented performers such as Cheech & Chong, Bob Saget, Louie Anderson, Roseanne Barr, David Spade, Rob Schneider, and Joan Rivers just to name a few. Plaintiff's work was consistently approved by Levine and recognized by CAA as

8

beneficial for their clients. Levine repeatedly encouraged Plaintiff and praised his professionalism, talent, and reliability. He regularly told Plaintiff that major opportunities were forthcoming, including approval to open for two new headliners, which were represented as essentially "locked in," giving Plaintiff every reason to believe these commitments were genuine.

Levine also informed Plaintiff that Plaintiff's books were being circulated to management companies with film and television capability. On March 26, 2024, Levine emailed: "I'm working on your stuff this week, FYI." On April 10, 2024, he followed up: "Books went out to 2 management companies who produce film and TV. Will work on the gigs next week," and, later that same day, "I'll follow up in a week." These specific written assurances were material, concrete representations that Defendants were actively promoting Plaintiff's career and that performance and development opportunities were soon forthcoming. Plaintiff reasonably relied on these statements in structuring his professional plans and expectations.

### Plaintiff Reports Explicit Videos from a CAA Client

The professional relationship deteriorated immediately after Plaintiff received explicit, perverse videos from a CAA-represented client and informed Levine. Plaintiff believed that as a responsible professional, he needed to report the misconduct to the agent representing the individual whose behavior had caused concern. Plaintiff attempted to share the evidence with Levine to ensure CAA could address the misconduct internally and prevent further inappropriate actions toward others.

In response, Levine refused to review the evidence. In a September 29, 2023 email, Levine wrote: "Just tell me (here). Videos really make me nervous." Levine's refusal to see the videos and his expressed discomfort signaled that Defendants did not wish to acknowledge the client's misconduct. Levine's subsequent instructions and conduct made it clear that Defendants' priority was to avoid any record of the client's behavior rather than to remedy it.

### Immediate Retaliation by Defendants

Once Plaintiff reported the explicit videos, Defendants withdrew all communication and abruptly cancelled every opportunity they had previously promised. Levine stopped responding to emails, cancelled Plaintiff's planned opening-act appearances for two headliners, halted the circulation of Plaintiff's books, and effectively erased Plaintiff from professional consideration. This sudden shift was not based on performance, conduct, or any legitimate business reason. Rather, it was a direct response to Plaintiff reporting misconduct by a financially valuable client.

Defendants' own communications also show their secret influence over the legal landscape. On September 20, 2023, Levine instructed Plaintiff: "Just tell your lawyer to ignore him or put him off," and further stated that the unnamed artist's attorney "has been told to stand down." This proves that CAA and Levine were coordinating or influencing attorneys in the background, while never disclosing these communications or their true role to Plaintiff. Plaintiff reasonably believed that his attorney was receiving independent communications, not influenced by Defendants' behind-the-scenes direction.

Defendants' actions had immediate and severe consequences for Plaintiff's career. They destroyed anticipated income, tarnished Plaintiff's professional reputation, and removed the opportunities Plaintiff relied upon. The retaliation created a chilling effect, sending the message that reporting misconduct would be punished, not remedied.

### Plaintiff's Medical and Emotional Vulnerability

During this retaliation, Plaintiff was enduring cancer treatment, a fact known to Defendants. Plaintiff had also survived the Maui wildfires, an event of extreme trauma that compounded the psychological stress he had already suffered. Plaintiff experienced recurring symptoms of emotional distress, confusion, anxiety, and hypervigilance following the wildfires but did not yet understand these symptoms as manifestations of PTSD. His undiagnosed condition impaired his ability to identify coercion and manipulation during this period, leaving him susceptible to undue influence.

Defendants were aware that Plaintiff was physically and emotionally strained, yet they exploited these circumstances to pressure Plaintiff into accepting the Second Settlement Agreement. Plaintiff's cancer treatment had left him physically weakened, financially strained, and emotionally vulnerable. His attempts to address the misconduct professionally were met with hostility, rejection, and escalating punitive conduct, creating enormous pressure on Plaintiff to "make it go away" rather than challenge an agency with far greater power and resources.

It was only after Plaintiff relocated to Florida and received a formal PTSD diagnosis in 2025 that he fully understood the extent to which Defendants took advantage of his

compromised state. The diagnosis illuminated the manipulative and coercive tactics

Defendants used to silence Plaintiff and suppress the truth.

**The First Settlement Agreement Did Not Involve CAA or Levine**

Plaintiff originally entered into a settlement agreement with the CAA client who sent the

explicit videos. This agreement had nothing to do with CAA or Levine. They were not

signatories, did not participate in negotiations, and provided no consideration. The

agreement was strictly between Plaintiff and the individual who had engaged in the

inappropriate conduct. Plaintiff's compensation under that agreement was independent of

CAA's involvement.

CAA and Levine had no contractual rights under the original agreement nor any legal

foundation to impose new conditions on Plaintiff in connection with that settlement.

Their sudden intervention following Plaintiff's report of misconduct reveals their intent

to protect themselves rather than address the wrongdoing. Their attempt to piggy-back

into that agreement as non-parties lacks consideration and mutuality.

**CAA and Levine Insert Themselves Into the Second Settlement Agreement**

Following the retaliation and silence, Defendants orchestrated a far more expansive and

coercive "Second Settlement Agreement." This agreement dramatically expanded the

scope of obligations on Plaintiff and provided sweeping protections to CAA and Levine

without requiring them to provide anything in return. The Second Settlement Agreement

prohibited Plaintiff from contacting CAA or Levine and conditioned Plaintiff's continued

compensation from the original settlement with the client on Plaintiff's compliance with

these new terms.

12

Critically, the Second Settlement Agreement contained a provision that if Plaintiff contacted CAA or Steve Levine in any way—including to follow up on professional opportunities and promises they themselves had made in writing—Plaintiff's settlement payments from the client would immediately stop. This clause weaponized Plaintiff's compensation from the original settlement, held it over his head, and coerced him into permanent silence regarding CAA and Levine. The provision served no legitimate purpose other than to protect Defendants from accountability.

Defendants' inclusion as protected beneficiaries in an agreement they had no connection to violates basic contract principles regarding consideration, mutuality, and fairness. Defendants provided no consideration. The only "benefit" they conferred was to themselves.

### The Coercive Undated Dismissal Forms

Defendants also required Plaintiff to sign undated, captionless dismissal forms with no jurisdiction specified, no case number, and no date. The forms were intentionally designed to be filed in any court Plaintiff might someday use to pursue justice. Their only purpose was to give Defendants the ability to instantly terminate any lawsuit by filing a pre-signed dismissal bearing Plaintiff's signature.

These forms reflect extreme procedural unfairness and substantive unconscionability. The lack of identifying information made their intended use opaque to Plaintiff at the time, especially in light of his impaired psychological state. They functioned as a pre-loaded trap to eject any future litigation before a judge could consider the merits.

### Plaintiff's PTSD Diagnosis Reveals the Coercion

13

When Plaintiff relocated to Florida and was formally diagnosed with PTSD in 2025, the diagnosis clarified the psychological manipulation Defendants had used. PTSD affects cognitive processing, risk assessment, and the ability to detect coercion. Plaintiff's symptoms had been ongoing since surviving the Maui wildfires, but he had not yet understood their impact on his decision-making during the negotiation of the Second Settlement Agreement.

Once diagnosed, Plaintiff recognized that Defendants had taken advantage of his vulnerability to enforce an agreement that suppressed his rights and prevented him from reporting their misconduct. This renders consent to the Second Settlement Agreement compromised and provides a powerful equitable basis for rescission.

### Regulatory Complaints

On or about the date of this filing, Plaintiff has also filed complaints with the California Labor Commissioner's Talent Agency Division, SAG-AFTRA, and the Federal Trade Commission regarding Defendants' conduct. These complaints reflect Plaintiff's attempt to seek oversight and accountability through formal channels.

### Ongoing Harm

Plaintiff continues to suffer financial damages, loss of career opportunities, emotional distress, and reputational harm in the State of Florida. Defendants' conduct has had long-term effects on Plaintiff's professional relationships, ability to book performances, and reputation within the entertainment industry. Plaintiff's publishing, music, performance, and production opportunities have all suffered as a direct result of Defendants' conduct.

The harm is ongoing and substantial, and Defendants' restrictions and retaliatory acts continue to affect Plaintiff's work and opportunities while he resides in Florida.

### CAA's Blacklisting Effectively Ended Plaintiff's Performance Career

Plaintiff was explicitly informed that he was banned from CAA, a prohibition that carried severe professional consequences because a substantial portion of the major headlining artists Plaintiff had historically opened for—including several he opened for before they ever signed with CAA—are now represented by the agency. As a result of Defendants' retaliatory conduct and the blacklist they imposed, Plaintiff was categorically eliminated from an entire segment of the touring and entertainment industry that had formed the core of his career. This ban, whether formal or informal, functioned as a complete barrier to future performance opportunities, materially interfering with Plaintiff's livelihood and causing long-term professional and economic harm.

### Defendants' Manipulation of the Counsel Requirement

Defendants insisted that Plaintiff could not execute the Second Settlement Agreement unless it was transmitted through an attorney, refusing to negotiate directly with Plaintiff despite knowing his vulnerable medical and emotional condition. However, although Defendants required the involvement of counsel, they provided Plaintiff's attorney only with the Addendum—and not with the full Second Settlement Agreement—thereby depriving Plaintiff of meaningful legal advice regarding the complete terms. This structure, imposed entirely by Defendants, created the false appearance of attorney review while intentionally preventing actual independent legal analysis of the full agreement. Such deliberate manipulation of the counsel requirement constitutes

procedural unconscionability, bad faith, and fraudulent inducement, and further supports

rescission of the Second Settlement Agreement.

### Additional Evidence of Blacklisting and Concealment

Following Plaintiff's reporting of misconduct and the sudden withdrawal of all promised

opportunities, Plaintiff submitted his book Horrorscope through his manager for standard

agency review. In response, Plaintiff received a highly irregular piece of correspondence

from CAA. The envelope was handwritten—an extraordinary deviation from CAA's

normal business practices, which rely on typed labels and assistant-prepared mail. Inside

the envelope was a typed but entirely generic note stating only: "We cannot represent

Brian Evans. Thank you. CAA." The letter bore no agent's name, no signature, no

department identification, and no explanation. This anonymous, untraceable rejection is

not consistent with any legitimate agency submission process and strongly evidences an

intentional internal directive to block Plaintiff without creating a paper trail. The

anonymity, handwritten envelope, and absence of attribution support Plaintiff's

allegations of retaliation, concealment, and blacklisting.

### Applicable Law

At this preliminary stage, Plaintiff cites both Florida and California case law to illustrate

generally applicable legal principles governing fraud, concealment, unconscionability,

bad faith, and related doctrines. To the extent Florida's choice-of-law rules later require a

more specific determination as to which state's substantive law governs particular issues,

Plaintiff's claims are viable under either state's standards on the issues presented in this

pleading.

Courts have repeatedly held that settlement agreements obtained through coercion, undue influence, or imbalanced bargaining power are unenforceable and subject to rescission. See Armendariz v. Foundation Health Psychcare Services, Inc., 24 Cal. 4th 83 (2000) (agreements are unconscionable when they arise from sharp practices, oppression, or surprise); A & M Produce Co. v. FMC Corp., 135 Cal. App. 3d 473 (1982) (substantive and procedural unconscionability invalidate contract provisions obtained through unequal bargaining power); Gatton v. T-Mobile USA, Inc., 152 Cal. App. 4th 571 (2007) (coercive contract structures designed to insulate a party from accountability are unenforceable). Florida law is consistent. See Kendall Imports, LLC v. Diaz, 215 So. 3d 95 (Fla. 3d DCA 2017) (contracts are voidable where assent is compromised by undue influence or manipulative conduct); Basulto v. Hialeah Automotive, 141 So. 3d 1145 (Fla. 2014) (courts will not enforce agreements obtained through procedural unfairness, deception, or circumstances preventing meaningful consent). These principles apply with particular force where, as here, a party exploits another's medical vulnerability, pressures the individual during a period of compromised judgment, and inserts sweeping protections for non-parties who provided no consideration. Such conduct renders the agreement unconscionable, unenforceable, and subject to rescission.

## COUNT I — FRAUDULENT INDUCEMENT

### (Against All Defendants)

Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

Defendants fraudulently induced Plaintiff into signing the Second Settlement Agreement by knowingly misrepresenting material facts and concealing critical information for their own financial protection. Fraudulent inducement occurs when a party intentionally uses deception to cause another to enter an agreement. See, e.g., Lazar v. Superior Court, 12 Cal. 4th 631 (1996); Johnson v. Davis, 480 So. 2d 625 (Fla. 1985) (fraud in inducing contract renders agreement voidable).

Defendants falsely represented that the Second Settlement Agreement was necessary and legitimate and suggested that Plaintiff needed to sign it in order to continue receiving settlement payments from the client. They concealed (a) that they were not parties to the original settlement; (b) that they were providing no consideration; (c) that they had secretly influenced attorneys; (d) that the agreement contained a clause terminating Plaintiff's payments if he contacted them; and (e) that the undated dismissal forms were designed to be used against Plaintiff in any future lawsuit.

Defendants' fraudulent representations were deliberate and calculated to take advantage of Plaintiff's compromised physical and emotional condition during cancer treatment and unrecognized PTSD. Under Engalla v. Permanente Medical Group, Inc., 15 Cal. 4th 951 (1997), misrepresentations designed to manipulate an individual's vulnerability invalidate contractual consent. Plaintiff relied on Defendants' misrepresentations in signing the Second Settlement Agreement, resulting in substantial harm. Plaintiff is prepared to provide the First and Second Settlement Agreements for in camera review to confirm the fraud inherent in their structure and terms.

**COUNT II — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

(Against All Defendants)

Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

Defendants' conduct constitutes intentional infliction of emotional distress because it was extreme, outrageous, malicious, and carried out with reckless disregard for Plaintiff's emotional wellbeing. The tort is defined under cases such as Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965 (1993), and Metropolitan Life Ins. Co. v. McCarson, 467 So. 2d 277 (Fla. 1985), which require conduct so outrageous as to go beyond all bounds of decency and cause severe emotional distress.

Defendants retaliated against Plaintiff for reporting misconduct, destroyed his professional opportunities, manipulated attorneys, imposed coercive settlement terms, and exploited his cancer treatment and PTSD. They engineered a legal structure that cut off his livelihood if he contacted them and attempted to pre-emptively extinguish any future lawsuit through undated dismissals. These acts are extreme and outrageous by any reasonable standard.

Plaintiff suffered severe emotional distress including anxiety, depression, fear, humiliation, and exacerbation of PTSD symptoms, requiring clinical evaluation and treatment after relocation to Florida. Defendants knew or should have known that such conduct would cause severe emotional harm.

## COUNT III — FRAUDULENT CONCEALMENT

(Against All Defendants)

19

Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

Defendants' scheme depended on concealing their true motives, their covert instructions to attorneys, the coercive nature of the Second Settlement Agreement, and the legal effect of the undated dismissal forms. Fraudulent concealment exists when a party with a duty to disclose material information intentionally withholds it. See LiMandri v. Judkins, 52 Cal. App. 4th 326 (1997); Blanco v. Bank of Am., 202 So. 3d 405 (Fla. 3d DCA 2016).



Defendants had a duty to disclose that they were strangers to the original settlement, that they provided no consideration, that their involvement was solely to protect themselves and their client, and that the agreement's primary purpose was to silence Plaintiff and terminate his legal rights. They also intentionally concealed that the undated dismissal forms could be filed in any jurisdiction and were designed specifically to deprive Plaintiff of access to justice.

Plaintiff could not have understood the true nature of the transaction because Defendants hid these critical facts and leveraged Plaintiff's medical and psychological vulnerability. Without full disclosure, Plaintiff's consent was not informed. The First and Second Settlement Agreements, which Plaintiff stands ready to submit for in camera inspection, will confirm the scope of Defendants' concealment.

## COUNT IV — BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

(Against All Defendants, Arising from the Second Settlement Agreement)

Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

Every contract contains an implied covenant of good faith and fair dealing. See Carma Developers v. Marathon Development California, Inc., 2 Cal. 4th 342 (1992); Cox v. CSX Intermodal, Inc., 732 So. 2d 1092 (Fla. 1st DCA 1999). By inserting themselves as protected beneficiaries into the Second Settlement Agreement and requiring Plaintiff's execution of that agreement as a condition of his continued receipt of settlement payments, Defendants assumed duties of good faith and fair dealing in the performance, enforcement, and exercise of rights under that agreement.

Defendants violated this covenant by acting in bad faith to manipulate the Second Settlement Agreement, frustrate Plaintiff's rights, and pursue improper motives. They used Plaintiff's dependency on settlement funds and his reliance on their prior promises to coerce him into accepting terms that stripped him of his rights. Under County of Brevard v. Miorelli Engineering, Inc., 703 So. 2d 1049 (Fla. 1997), acts designed to frustrate a party's contractual expectations constitute a breach of the implied covenant.

Defendants' conduct—retaliating, concealing, and structuring an agreement that served only their interests—demonstrates bad faith and entitles Plaintiff to damages and equitable relief.

## COUNT V — DECLARATORY RELIEF

(Invalidity of the Second Settlement Agreement and Undated Dismissals)

Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

Plaintiff seeks a declaration under 28 U.S.C. § 2201 that the Second Settlement Agreement is unenforceable due to fraud, coercion, lack of consideration, procedural unconscionability, and substantive unfairness, and that the undated dismissal forms are void and unenforceable. Declaratory relief is appropriate when parties face uncertainty regarding their rights or obligations under a disputed agreement. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007).

The Second Settlement Agreement was structured to benefit only Defendants—non-signatories to the original settlement—and to impose oppressive restrictions on Plaintiff, offering him no new consideration. The coercive clause terminating Plaintiff's payments if he contacted Defendants, combined with the undated dismissal forms, demonstrates that the agreement's true purpose was to extinguish Plaintiff's rights, not to resolve a legitimate dispute.

Plaintiff requests a judicial declaration that the Second Settlement Agreement and the undated dismissals are void as against public policy. Plaintiff stands ready to submit these instruments for in camera review so the Court may evaluate them directly.

## COUNT VI — RESCISSION OF CONTRACT

### (Bad-Faith Second Settlement Agreement)

Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

Plaintiff seeks rescission of the Second Settlement Agreement because it was procured through coercion, undue influence, fraud, misrepresentation, and exploitation of Plaintiff's medical and emotional vulnerability. Consent to a contract is not valid when obtained under such circumstances. The equitable remedy of rescission is appropriate to restore the parties to their pre-agreement positions.

Defendants exploited Plaintiff's cancer treatment and undiagnosed PTSD to pressure him into signing an agreement that stripped him of rights and gave Defendants complete protection without consideration. The coercive payment-termination clause and the undated dismissals underscore the agreement's oppressive character.

Equity and public policy require that the Second Settlement Agreement be rescinded. The Court can verify the unconscionable nature of the agreement and related documents through in camera review if the Court so directs.

## COUNT VII — TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

(Against All Defendants)

Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

Defendants intentionally interfered with Plaintiff's professional opportunities by withdrawing promised performances, halting circulation of Plaintiff's books, severing communication, and abandoning Plaintiff following his report of misconduct. Tortious interference occurs when a defendant intentionally disrupts an existing or reasonably

probable economic relationship. See Korea Supply Co. v. Lockheed Martin Corp., 29

Cal. 4th 1134 (2003); Tamiami Trail Tours, Inc. v. Cotton, 463 So. 2d 1126 (Fla. 1985).

Plaintiff had a reasonable expectation of significant economic benefits from the multiple

headliner performances Defendants promised, from ongoing industry circulation of his

books, and from the continuing agency relationship with CAA and Levine. Defendants

intentionally destroyed these expectancies in retaliation for Plaintiff's report of

misconduct.

Their interference was wrongful because it was motivated by self-protection and

retaliation rather than legitimate business reasons. See KMS Restaurant Corp. v. Wendy's

Int'l, Inc., 361 F.3d 1321 (11th Cir. 2004) (interference motivated by self-interest and not

fair competition is actionable). Plaintiff suffered significant financial harm, career

setbacks, and reputational injury as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor

and grant the following relief:

1.    Rescission of the Second Settlement Agreement in its entirety;

2.    Declaratory judgment that the undated dismissal forms are void and

unenforceable;

3.    Declaratory judgment that the Second Settlement Agreement is unconscionable

and unenforceable as against public policy;

4.      Compensatory damages in an amount to be determined at trial for emotional distress, financial loss, reputational harm, and loss of professional opportunities;

5.      Punitive damages against all Defendants for their malicious, fraudulent, and retaliatory conduct;

6.    Injunctive relief prohibiting Defendants from enforcing or relying on the Second Settlement Agreement or the dismissal forms in any jurisdiction;

7.      Attorneys' fees and costs where allowed by law; and

8.      Any other relief the Court deems just and proper.

Plaintiff appears pro se at this time only because he has been unable to locate counsel without conflicts due to Defendants' extensive industry footprint; Plaintiff will retain counsel if and when one becomes available.

**JURY DEMAND**

Plaintiff demands trial by jury on all claims so triable.

Respectfully submitted,

Brian Evans

2080 South Ocean Drive, #1505

Hallandale Beach, FL 33009

25

954-214-3076

belasvegas@yahoo.com

Plaintiff, Pro Se

Date: November 20, 2025

Apply shipping documents on this side.

Do not use this envelope for:

**UPS Ground®**
**UPS Standard®**
**UPS 3 Day Select®**
**UPS Worldwide Expedited®**

Visit **theupsstore.com** to learn more about our Print & Business Services.

Serving you for more than 100 years
United Parcel Service.

**United Parcel Service**   08/21   01880250709

The UPS Store RFID Label

1Z361E8301416766139
# Tracking

CLERK OF THE COURT
400 N MIAMI AVE
RM 8N09
MIAMI FL 33128

P:YELLOW S:PD7

DT1-2072

HIPS8 25.9.1 ZMZ8M
S1E055968E
3389

6139

1:PD7

X

1030

Nov 21 03:13:40 2025

SHIP MTL: 11
DATE: 20 NOV 2025

BRIAN EVANS
(954) 214-3076
#1505
2080 S OCEAN DR
HALLANDALE BEAC FL 33009

SHIP US DISTRICT COURT SOUTHERN DISTRICT
TO: CLERK OF THE COURT
RM 8N09
400 N MIAMI AVE

MIAMI FL 33128-1805

FL 330 9-03

**UPS NEXT DAY AIR**

1

TRACKING #: 1Z 361 E83 01 4167 6139

BILLING: P/P

NOV 21 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

REF #1: JP
REF #2: EST NG

stic Shipments

qualify for the Letter rate, UPS Express Envelopes may only contain
correspondence, urgent documents, and/or electronic media and must
igh 8 oz. or less. UPS Express Envelopes containing items other than
se listed or weighing more than 8 oz. will be billed by weight.

national Shipments

e UPS Express Envelope may be used only for documents of no commercial
lue. Certain countries consider electronic media as documents. Visit
s.com/importexport to verify if your shipment is classified as a document.

quality for the Letter rate, the UPS Express Envelope must weigh 8 oz. or less.
PS Express Envelopes weighing more than 8 oz. will be billed by weight.

e: Express Envelopes are not recommended for shipments of electronic media
taining sensitive personal information or breakable items. Do not send cash
ash equivalent.

**theupsstore.com** to find a location near you.